**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE COUNTY OF DAKOTA, NEBRASKA, THE SHEET METAL WORKERS LOCAL NO. 40 HEALTH FUND, THE HARLEM SCHOOL DISTRICT 122, 4DUBS BBQ, INC., assignee of "DUSTIN'S BAR-B-Q INC.,"** | **CIVIL ACTION** |
|         **Plaintiffs,** | **NO.  24-4276** |
|         **v.** | |
| **UNITED BIOSOURCE CORPORATION, now known as "UNITED BIOSOURCE LLC," a wholly owned subsidiary of United Biosource Holdings, Inc., EVERNORTH HEALTH, INC., formerly known as "EXPRESS SCRIPTS HOLDING COMPANY," EXPRESS SCRIPTS, INC., PRIORITY HEALTHCARE CORP. and PRIORITY HEALTHCARE DISTRIBTION, INC., respectively doing business as "CURASCRIPT SD," and "CURASCRIPT SPECIALTY DISTRIBUTION SD," CURASCRIPT SD and ACCREDO HEALTH GROUP, INC., formerly known as "CURASCRIPT S.P."** | |
|         **Defendants.** | |

**HODGE, J.**                                                                     **March 5, 2026**

## MEMORANDUM

      This case concerns an alleged scheme by non-party Mallinckrodt ARD LLC ("Mallinckrodt"), the manufacturer of the prescription drug H.P. Acthar Gel ("Acthar"), and a conglomerate of United Biosource Corporation; Evernorth Health, Inc.; Express Scripts, Inc.; Priority Healthcare Corp. and Priority Healthcare Distribution, Inc.; Curascript SD; and Accredo

Health Group, Inc. (together, "Defendants" or the "Express Scripts Entities") to remove Acthar from retail distribution and raise its price by over 100,000%. Plaintiffs, the County of Dakota, Nebraska ("Dakota County"), the Sheet Metal Workers Local No. 40 Health Fund ("SMW Local 40"), the Harlem School District 122 ("Harlem SD 122"), and Dustin's Bar-B-Q Inc. ("Dustin's") (together, "Plaintiffs"), are third party payors seeking to recover overpayments for Acthar caused by Defendants' alleged scheme to inflate the price of the drug.

Before the Court is Defendants' Motion to Dismiss the Amended Complaint (ECF No. 23 (the "Motion")), Plaintiffs' Response in Opposition (ECF No. 28), and Defendants' Reply to Plaintiffs' Opposition (ECF No. 29). Also before the Court are the Parties' notices of supplemental authority in support of their briefing on the Motion (ECF Nos. 30, 31, 32, 35, 37), as well as Plaintiffs' Motion to Strike Defendants' Notice of Supplemental Authority (ECF No. 33), Defendants' Response thereto (ECF No. 34), and Plaintiffs' Reply in further support of their Motion to Strike (ECF No. 36).

Plaintiffs' Amended Complaint (ECF No. 8 ("Am. Compl.")) alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts 1–2), violations of various state consumer protection laws (Counts 3–6, 8), negligent misrepresentation (Count 7), aiding and abetting (Count 8), unjust enrichment (Count 9), violations of state and federal antitrust statutes (Counts 10–12), and conspiracy to defraud (Count 13), and requests declaratory and injunctive relief (Count 14). For the reasons that follow, Defendants' Motion to Dismiss is granted.

## I.    FACTUAL BACKGROUND[1]

The following allegations are taken from the Amended Complaint, and the Court accepts, as it must, all non-conclusory allegations as true for the purposes of the Motion to Dismiss.

### i.    The Parties[2]

Mallinckrodt manufactures, markets, distributes, and sells Acthar. (Am. Compl. ¶ 17.) Acthar is an adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones. (*Id.* ¶ 134.) In July 2001, Questcor Pharmaceuticals, Inc. ("Questcor") acquired Acthar from Aventis Pharmaceutical Products, Inc. for $100,000. (*Id.* ¶ 237.) The FDA approved Acthar for two indications on its label: monotherapy for the treatment of infantile spasms ("IS") and treatment of acute exacerbations of Multiple Sclerosis ("MS"). (*Id.* ¶ 219.)[3] In 2014, Mallinckrodt acquired Questcor for approximately $5.9 billion.[4] (*Id.* ¶ 114.) In October 2020, Mallinckrodt filed for Chapter 11 bankruptcy in Delaware. *In re Mallinckrodt PLC*, Case No. 1:20-

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

[2] The Court notes that the Amended Complaint incorrectly defines "Defendants" as Mallinckrodt and Express Scripts (Am. Compl. ¶ 130), but Mallinckrodt is not and has never been a defendant in this action. The Court cannot evaluate allegations that do not state with particularity which Defendant (or non-party) they relate to. (*See, e.g.*, *id.* ¶ 293 ("Further, Plaintiffs have paid the inflated AWPs directly set and charged by Defendants.").) If Plaintiffs choose to replead, they must clearly articulate which allegations in the second amended complaint refer to what parties and non-parties to this action.

[3] The Amended Complaint is unclear regarding what indications Acthar is currently approved for. Plaintiffs allege that Acthar was approved by the FDA in 1952 for over 50 conditions, and this list has been reduced to "19 indications" in the "present day." (Am. Compl. ¶¶ 132, 206–11.) However, the Amended Complaint also alleges that "the FDA has only ever approved Acthar for two narrow indications: Infantile Spasms (IS) and acute exacerbations of multiple sclerosis (MS). It has never been approved for the long-term treatment of any disease." (*Id.* ¶ 133.) Plaintiffs do not provide any further information regarding this discrepancy.

[4] Throughout the Amended Complaint, Plaintiffs inconsistently refer to Questcor and Mallinckrodt as interchangeable entities. The same is true of other legacy and present-day entities, such as Accredo and CuraScript SP, which Plaintiffs sometimes also refer to as "Accredo/Curascript SP." For simplification purposes the Court refers to all entities by their current, non-legacy name, including when they were in their legacy form.

bk-12522 (Bankr. D. Del.) (the "Bankruptcy Proceedings"); (*Id.* ¶ 117.). In April 2022, claims against Mallinckrodt arising prior to October 2020, and similar to those asserted against Defendants here, were discharged in the Bankruptcy Proceedings. (Am. Compl. ¶ 117.) Mallinckrodt is not, nor has it ever been, a party to the current action.

Plaintiffs Dakota County, SMW Local 40, Harlem SD 122, and Dustin's are third party payors ("TPPs") who provide healthcare benefits, including prescription drug benefits, to their employees through contracts with other healthcare organizations. (*Id.* ¶¶ 93–111.)

Express Scripts, Inc. ("Express Scripts") is a pharmacy benefits manager ("PBM") that contracted with TPPs like Plaintiffs to lower the costs of drugs. (*Id.* ¶ 82.) Express Scripts also contracted with Mallinckrodt for price discounts. (*Id.*) Priority Healthcare Corp. and Priority Healthcare Distribution, Inc., d/b/a Curascript, SD, f/k/a CuraScript Pharmacy, Inc. ("CuraScript") is a wholly owned subsidiary of Express Scripts. (*Id.* ¶ 119.) It was acquired by Express Scripts in January 2004 and was expanded when Express Scripts acquired Priority Healthcare Corporation in October 2005. (*Id.*) CuraScript is Mallinckrodt's exclusive specialty pharmacy distributor for Acthar. (*Id.* ¶ 120.)

Accredo Health Group, Inc., f/k/a CuraScript S.P. ("Accredo") is Express Script's legacy specialty pharmacy operation. (*Id.* ¶¶ 68, 121.) Express Scripts merged with Medco in 2012, and CuraScript S.P. was integrated into Medco's specialty pharmacy business, Accredo. (*Id.* ¶ 68.) The new, integrated operation was called Accredo. (*Id.*) Accredo received Acthar from CuraScript's warehouse, dispensed it directly to some of Plaintiffs' beneficiaries, then billed the patients and their TPPs. (*Id.*)

Beginning in 2007, Healthbridge was Express Script's legacy "hub" operation. (*Id.* ¶¶ 70, 123, 128.) As a hub, Healthbridge was responsible for controlling prescription processing and

4

benefits coordination with patients and TPPs. (*Id.* ¶ 33.) Healthbridge was integrated into United BioSource ("UBC") when Express Scripts merged with Medco in 2012. (*Id.* ¶ 70.) The new integrated operation was called UBC. (*Id.*) UBC acted as Mallinckrodt's exclusive agent in the processing of Acthar prescriptions through the Acthar Support and Access Program ("ASAP"). (*Id.* ¶¶ 70, 127.) Doctors would call Acthar prescriptions into the hub, which would confirm and authorize insurance coverage. (*Id.* ¶ 284.) Then, the hub would direct Accredo to fill the prescription. (*Id.* ¶ 66.) Express Scripts sold UBC in November 2017 to Avista Capital Partners. (*Id.* ¶ 126.) CuraScript, Accredo, and UBC were all wholly-owned subsidiaries of Express Scripts from 2007 through 2017. (*Id.* ¶ 81.) Express Scripts is now a wholly-owned subsidiary of Evernorth Health, Inc., f/k/a Express Scripts Holding Company ("Evernorth"). (*Id.* ¶ 82.)

### ii.    The "New Strategy"

In 2007, Mallinckrodt and Express Scripts created a so-called "new strategy" for selling, distributing, and marketing Acthar. (*Id.*¶ 31.) This new strategy involved "re-launch[ing]" Acthar with a limited distribution system at a higher price to make it appear as if the product were a new drug "being launched as the only product indicated for IS," which was an "off-label" indication until the FDA approved it in 2010.[5] (*Id.* ¶¶ 239, 273.) Mallinckrodt and the Express Scripts Entities would then work to market the drug for additional off-label indications to increase demand for the drug.

---

[5] As defined by the Amended Complaint, "off-label" refers to the use of a drug for any purpose other than what is described in the drug's labeling. (Am. Compl. ¶ 152.) For Acthar, off-label use included prescribing the drug for any condition other than its two FDA-approved uses—IS and MS, although as noted in this opinion the Amended Complaint contains discrepancies as to how many uses the FDA has actually approved the drug for. (*Id.* ¶ 133.)

1.  *The Distribution Scheme*

In 2006, Express Scripts proposed that Mallinckrodt remove Acthar from wholesale distribution and move it to exclusive "specialty" distribution through CuraScript. (*Id.* ¶ 22.) Acthar would then be labelled a "specialty pharmaceutical," although it had never been deemed as such before. (*Id.* ¶ 20.) The distribution scheme limited the distribution of Achtar from multiple wholesale and retail outlets to just one exclusive outlet, CuraScript—a subsidiary of Express Scripts—after June 2007. (*Id.* ¶¶ 33, 67.) CuraScript engaged UBC to act as the "hub" that processed Acthar prescriptions and coordinated benefits with patients and TPPs. (*Id.* ¶ 33.) Accredo was engaged as the preferred specialty pharmacy. (*Id.*)

As part of the distribution scheme, Mallinckrodt and UBC created the ASAP. (*Id.* ¶¶ 34, 71.) Under the ASAP, a patient or physician seeking an Acthar prescription was directed to UBC and then required to return the Acthar Start Form to UBC. (*Id.* ¶¶ 283, 500.) UBC then confirmed the Acthar prescription with the provider, verified the patient's insurance coverage, and arranged for the Acthar to be delivered to the patient by CuraScript. (*Id.* ¶¶ 284, 286.) The Acthar Start Form also authorized UBC or any other operator of the ASAP to provide Acthar and receive payment for it from the patient and/or the TPP. (*Id.* ¶¶ 281–82, 287–88.) Possession and title to Acthar passed from Mallinckrodt to the patient and TPP after UBC's sign-off on the Acthar Start Form. (*Id.* ¶ 290.) The Acthar Start Form also authorized Mallinckrodt and UBC to provide certain services to the patient, including home injection training, which UBC arranged for. (*Id.* ¶¶ 288, 293)

In exchange for agreeing that the Express Scripts Entities would exclusively distribute Acthar, Express Scripts allegedly agreed with Mallinckrodt to raise the price of Acthar 100,000%. (*Id.* ¶¶ 20, 23.) Mallinckrodt signed contracts with CuraScript and UBC in June 2007

memorializing the exclusive distribution of Acthar and that UBC would be the exclusive hub for the ASAP. (*Id.* ¶ 262.) The companies publicly announced the exclusive relationship in July 2007. (*Id.* ¶¶ 496, 661.) This exclusive arrangement between the Express Scripts Entities and Mallinckrodt lasted from 2007 through 2017. (*Id.* ¶ 758.)

### 2. The Pricing Scheme

At the time that Mallinckrodt (then Questcor) acquired Acthar in July 2001, the average wholesale price ("AWP") for a vial was approximately $40. (*Id.* ¶ 298.) In September 2001, Mallinckrodt raised the AWP per vial to $935.20. (*Id.* ¶ 299.) From 2001 until 2007, the Acthar AWP grew from $935.20 to $2,062.79. (*Id.* ¶ 301.) Once the exclusive distribution scheme was implemented, from August 2007 through 2018 Mallinckrodt and Express Scripts agreed to raise the AWPs of Acthar to over $40,000. (*Id.* ¶ 322.) This agreement to set the price of Acthar was reflected in contracts, agreements, and understandings between Mallinckrodt and Defendants. (*Id.* ¶ 661.) Defendants "did not push back" on the price increases. (*Id.* ¶ 338.)

In 2007, when asked about the price increase, Express Scripts' Chief Medical Officer, Steve Miller, stated that "[t]he increase was a manufacturing decision," meaning it was Mallinckrodt's decision, and he "[could not] comment on it." (*Id.* ¶ 339.) In May 2017, Express Scripts' Senior Vice President, Supply Chain and Specialty Pharma, Everett Nevill, stated in response to a question during a private investor conference, "I think everybody in our company would agree, that the product is vastly overpriced for the value. We don't set the price. We've told [Mallinckrodt] that. I personally told [Mallinckrodt's] management team that their drug is hugely overpriced. I know Steve has as well." (*Id.* ¶ 341.)

### 3. The Marketing Scheme

The marketing scheme promoted by Defendants and Mallinckrodt sought to broaden the customer base of Acthar by promoting it for unapproved uses and doses, misrepresenting the efficacy of Acthar, and issuing false statements about the reasons that the price of Acthar increased.

The Amended Complaint describes Mallinckrodt's scheme as a "white coat marketing scheme" that was used for off-label promotion of Acthar for new indications. (*Id.* ¶¶ 393–94.) Through this scheme, Mallinckrodt and the Express Scripts Entities bribed Mallinckrodt's "key opinion leaders" or "KOLs" from around the country to serve as "spokes-doctors" to promote prescriptions of Acthar for unapproved uses and doses. (*Id.* ¶ 38.) These bribes included compensation from Mallinckrodt to certain KOLs for their "loyalty" to the company, including for speaking at various engagements about Acthar's off-label uses. (*Id.* ¶¶ 381–87.)

Additionally, the marketing scheme funneled tens of millions of dollars to UBC to run a "patient assistance program" ("PAP") to reduce co-pays for patients. (*Id.* ¶ 38.) The PAP allowed Mallinckrodt to shift the costs of Acthar to private payors. (*Id.* ¶ 435.) Mallinckrodt paid copay subsidies to a foundation called the Chronic Disease Fund ("CDF") then UBC sent Medicare and private payor patients to the CDF to receive the subsidies, which were used for Acthar to the exclusion of other drugs. (*Id.* ¶¶ 437–38, 441.)

Mallinckrodt also used UBC's reimbursement specialists as a mouthpiece to deliver allegedly false messages about the value of Acthar relative to its price, why Acthar's price increased, Acthar's unapproved uses and doses, and its benefits in relation to other treatments. (*Id.* ¶¶ 277, 432, 719.) The UBC reimbursement specialists were "directly trained by Mallinckrodt" and followed the Standard Operating Procedure ("SOP") created by Mallinckrodt. (*Id.* ¶ 184, 432.) The SOP included a section on off-label usage of Acthar and the process by which UBC was to

approve off-label prescriptions. (*Id.* ¶¶ 184, 191.) The SOP also reflected that Mallinckrodt knew that the "exact mechanisms of action of [Acthar] in the treatment of infantile spasms [were] not fully understood," but this lack of understanding did not impact their training of UBC's reimbursement specialists, who were responsible for passing on Mallinckrodt's messages about Acthar's uses and benefits. (*Id.* ¶¶ 415, 421.)

The SOP also shows that UBC was "trained to misrepresent the reasons for the 2007 price increase" and provided talking points for UBC personnel to use when discussing the price increase with doctors, patients, and representatives of TPPs. (*Id.* ¶ 192.) The Mallinckrodt-supplied talking points explained that Acthar's price increase was necessary to ensure the drug's "long term viability and availability" and that it had "never been a profitable drug because it is not only a difficult and expensive drug to manufacture, but is also a highly specialized, very low volume product." (*Id.* ¶¶ 192, 719.) Additionally, the talking points explain that the National Organization for Rare Disorders ("NORD") set up a rationing program for Acthar in the 1990s since it was often not available during that time. (*Id.* ¶ 719.)

In another attempt to broaden Acthar's customer base, UBC partnered with Mallinckrodt to market a five-day, pulse therapy Acthar regimen created by Dr. Staley Brod for the widespread treatment of MS. (*Id.* ¶ 73.) UBC employees were trained by Mallinckrodt to relay the allegedly misleading messages about Acthar's FDA approval for the five-day dose regimen to TPPs and allegedly did convey those false messages. (*Id.* ¶¶ 75–76.)

The Amended Complaint also details non-party Dr. David Mandel's role in promoting Acthar for unapproved uses and doses. Dr. Mandel allegedly misrepresented and deceived patients and payors about the Acthar mechanism of action and its limited FDA approval. (*Id.* ¶ 403) When TPPs denied Acthar prescriptions, Dr. Mandel sent letters appealing those denials to UBC, which

then directed them to the payor. (*Id.* ¶ 404, 406.) These letters allegedly contained false and misleading statements about the "limited FDA approval of Acthar and its purported [mechanism of action]." (*Id.* ¶¶ 404, 427.)

### iii.    The Synacthen Acquisition

Through its price increases, Mallinckrodt increased its revenue from Acthar sales from less than $1 million in 2001 to $798.9 million in 2013. (*Id.* ¶ 542.) Mallinckrodt was able to achieve this increase in part because, at all times relevant to this case, there were no reasonably available substitutes for Acthar and therefore Mallinckrodt possessed monopoly power in the relevant product market. (*Id.* ¶¶ 551, 554.)

In 2009, Mallinckrodt identified a competitive threat to its monopoly power in the ACTH market—Novartis AG's Synacthen Depot ("Synacthen"), a synthetically derived ACTH medication. (*Id.* ¶ 543.) Synacthen had not yet been approved by the FDA, but Mallinckrodt recognized that potential entry of Synacthen in the U.S. market for ACTH drugs would threaten its monopoly. (*Id.* ¶ 543.) In 2009, Mallinckrodt tried to buy the rights to the drug but failed. (*Id.* ¶ 543.) In 2013, Novartis agreed to sell Synacthen to Retrophin, Inc. (*Id.* ¶ 544.) However, Mallinckrodt disrupted the bidding process for Synacthen and licensed Synacthen from Novartis for more than eight times what Retrophin had agreed to buy the drug for. (*Id.* ¶¶ 545, 582.) Mallinckrodt did not seek FDA approval to bring Synacthen to market after it bought the rights. (*Id.* ¶ 582.) Instead, Mallinckrodt kept it off the market and raised Acthar prices. (*Id.* ¶¶ 545–46.)

### iv.   Related Lawsuits

The Express Scripts Entities are defendants in multiple lawsuits brought by various other TPPs, including TPPs represented by Plaintiffs' counsel in this action. (ECF No. 29 at 1.) Plaintiffs describe at length in their Amended Complaint various actions that name Mallinckrodt as a Defendant but that do not name the Express Scripts Entities, or, alternatively, actions that name the Express Scripts Entities but do not relate to Acthar. For purposes of evaluating Defendants' Motion, the Court has focused on the federal actions Plaintiffs and Defendants have identified in their papers that directly pertain to the parties and issues in this case.[6] (*See, e.g.*, Am. Compl. ¶¶ 335, 356; ECF No. 23-1 at 32–34.)

### 1.   *The Rockford Case*

In April 2017, Plaintiffs' counsel in this case filed a class action in the Northern District of Illinois on behalf of the City of Rockford, Illinois ("Rockford") and Acument Global Technologies

---

[6] The parties have filed various notices of supplemental authority on the docket, which the Court has taken into consideration as appropriate. (*See* ECF Nos. 30, 31, 32, 35, 37.) Plaintiffs filed a Motion to Strike Defendants' Notice of Supplemental Authority. (ECF No. 33.) The Supplemental Authority Notice at issue in the Motion to Strike (ECF No. 31) notified the Court of an order entered by the Honorable Paula Patrick, Philadelphia Court of Common Pleas on January 22, 2025, sustaining the Express Scripts Entities' preliminary objections in *Law Enforcement Health Benefits, Inc. v. Greenhouse*, Case No. 240301976 (Pa. Com. Pl. Jan. 21, 2025) ("LEHB"). Plaintiffs' Motion to Strike notes that Judge Patrick recused herself from the case and the January 22, 2025 LEHB Order was vacated. (ECF No. 33 at 2–3.) Additionally, Plaintiffs note in their Reply to the Motion to Strike that Judge Patrick's August 20, 2024 order in LEHB was also vacated for similar reasons. (ECF No. 36.) The Court notes that Defendants immediately notified the Court on their own volition that the two LEHB orders were vacated and therefore Plaintiffs' Motion to Strike is Moot. (ECF Nos. 32, 35.) This Court urges the parties to avoid unnecessary motions practice in the future and follow this Court's order in this case requiring that "[s]even (7) days prior to any motion being filed . . . counsel must notify opposing counsel to discuss the substance of the potential motion, and the possible resolution of the same." (ECF No. 4 at 1.)

Inc. ("Acument") and a putative class of similarly situated TPPs, including Plaintiffs in this litigation, against Mallinckrodt and the Express Scripts Entities. *City of Rockford v. Mallinckrodt ARD, Inc., et al.*, No. 3:17-cv-50107 (N.D. Ill.); (Am. Compl. ¶ 48.). The second amended complaint alleged that Mallinckrodt and the Express Scripts Entities violated federal and state antitrust and consumer protection laws, RICO, and various other state laws by illegally maintaining and enhancing Mallinckrodt's monopoly power in the ACTH market. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 743 (N.D. Ill. 2019). On January 25, 2019, the *Rockford* court denied in part the Express Scripts Entities' motions to dismiss, permitting Rockford's antitrust claims to proceed and allowing plaintiffs leave to replead. *Id.* at 778; (Am. Compl. ¶ 49.). The *Rockford* court found that Acument did not have antitrust standing for the federal claims because the plaintiffs did not plausibly allege that it was a direct purchaser from a member of the alleged conspiracy. *Rockford*, 360 F. Supp. 3d at 752. The court did find that Rockford had alleged antitrust standing, and that it had plausibly stated both Section 1 and Section 2 claims under the Sherman Act against Mallinckrodt and the Express Scripts Entities based on (1) the exclusive dealing arrangement and (2) the Synacthen acquisition. *Id.* at 754–57.

The *Rockford* court dismissed the RICO claims for failure to adequately plead the predicate acts of mail and wire fraud under the Rule 9(b) standard. *Id.* at 773–74. The court noted that "plaintiffs allege little more than the existence of a price-fix scheme and defendants' intent to misrepresent prices, which is different than alleging the 'who, what, when, where and how' of an actual misrepresentation." *Id.* at 774 (citations omitted). Additionally, the court held that plaintiffs had inadequately pled proximate cause for the alleged RICO violation because it was "unclear how either Mallinckrodt or Express Scripts communicated <u>any</u>, 'misrepresentations,' let alone

communications made directly, to either [plaintiff]." *Id.* at 775. The court dismissed the fraud and conspiracy to defraud claims upon similar reasoning. *Id.* at 776–77.

> 2. *The Washington County Case*

In June 2019, Plaintiffs' counsel in this case filed a complaint in the District of Maryland on behalf of the Washington County Board of Education against Mallinckrodt, the Express Scripts Entities, and a former board member of Questcor. *Wash. Cnty. Bd. Of Educ. v. Mallinckrodt ARD, Inc.*, No. 1:19-cv-01854 (D. Md.). The amended complaint alleged that the defendants raised Acthar's price through similar schemes alleged here, raising claims of violation of the Maryland Consumer Protection Act ("MCPA"), negligent misrepresentation, fraud, unjust enrichment, and conspiracy to defraud. *Wash. Cnty. Bd. of Educ.*, No. 1:19-cv-01854 (ECF No. 36); s*ee Wash. Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc*., 431 F. Supp. 3d 698 (D. Md. 2020). The court granted the defendants' motions to dismiss on all counts.

With respect to the MCPA claim, the court found that the plaintiff failed to identify any actionable misrepresentation on five bases—(1) Mallinckrodt and Express Scripts disclosed their decision to enter into an exclusive distributorship in 2007, (2) the "artificial" and "inflated" AWPs of Acthar did not constitute false representations, (3) plaintiff failed to allege that it relied on the allegedly false statements to the market about Acthar's price, (4) plaintiff failed to identify a misrepresentation related to the PAP, and (5) plaintiff failed to allege it actually received any false information from KOLs. *Id.* at 711–14. As for the negligent misrepresentation claim, the court held the Acthar Start Form could not serve as the basis for that claim because (1) plaintiff did not allege it ever saw the Acthar Start Form, and (2) the assertion that plaintiff relied on the alleged misstatements in the form was conclusory. *Id.* at 716. The court also dismissed the fraud claim

because "there is nothing inherently fraudulent about charging a high price for a product." *Id.* at 717.

       *3. The Steamfitters Case*

In July 2019, Plaintiffs' counsel in this case filed a class action complaint in this district against Mallinckrodt and UBC on behalf of Steamfitters Local Union No. 420 ("Steamfitters") and similarly situated TPPs. *Steamfitters Local Union 420 v. Mallinckrodt ARD, LLC, et al.*, No. 2:19-cv-03047 (E.D. Pa.). The complaint alleges violations of the federal RICO statute and state consumer fraud laws related to Mallinckrodt and UBC's marketing and distribution of Acthar. (*See* AC ¶ 62.) In a December 19, 2019 one-page order issued by Judge Schiller, the court denied defendants' motions to dismiss. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 57).

In August 2023, the *Steamfitters* case was reassigned to this Court. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 131). Defendant UBC argued that the *Steamfitters* proceedings should be bifurcated based on the potential collateral estoppel effects of the decision of *In re Mallinckrodt PLC*, 638 B.R. 57 (Bankr. D. Del. 2021), which was issued as part of Mallinckrodt's Bankruptcy Proceedings. *See, e.g.*, *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. No. 113). In an October 31, 2025 order and memorandum, this Court denied Defendant's request to bifurcate and found that the Bankruptcy court's decision did not act as collateral estoppel to Plaintiff's claims. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (ECF Nos. 152, 153).

       *4. The Plumbers Case*

In November 2019, Plaintiffs' counsel in this case filed a class action complaint in the District of New Jersey on behalf of the United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("Plumbers") and similarly situated TPPs against Mallinckrodt and the Express Scripts Entities, as well as an individual sales specialist. *Plumbers & Pipefitters Local 322*

14

*of S.N.J. v. Mallinckrodt ARD, LLC*, et al., No. 1:20-cv-00188 (D.N.J.). Similar to the allegations

in the *Rockford* and *Steamfitters* matters, the amended complaint alleged that the Express Scripts

Entities and Mallinckrodt violated the New Jersey Antitrust Act and the New Jersey Consumer

Fraud Act by illegally "maintain[ing] and enhanc[ing] Mallinckrodt's monopoly power in the

ACTH market" by "agree[ing] to maintain the supracompetitive prices of Acthar through the

ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter

the ACTH market." *Plumbers*, No. 1:20-cv-00188 (Dkt. No. 50 ¶¶ 611, 614). Additionally, the

amended complaint alleged that the Express Scripts Entities and Debtors violated New Jersey

RICO by "creat[ing] [an] exclusive distribution arrangement to limit and control distribution and

output of Acthar, and to raise the prices of Acthar to unconscionable levels," "willfully

manipulat[ing] and inflat[ing] the prices paid by TPPs for Acthar." *Id.* ¶ 10. The amended

complaint also brought negligent misrepresentation, civil conspiracy, and unjust enrichment

claims.

The *Plumbers* court granted the Express Scripts Entities' motion to dismiss. *United Ass'n

of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC*, 2020 WL 5627149

(D.N.J. Aug. 18, 2020). In doing so, the court looked to caselaw on the federal RICO statute when

interpreting New Jersey's RICO statute. *Id.* at 17. Similar to the *Rockford* court, the *Plumbers*

court dismissed the RICO claims because plaintiff failed to meet Rule 9(b)'s pleading standard for

the predicate crimes of wire and mail fraud. *Id.* at 18. The court explained that plaintiff did not

identify any specific misrepresentations made in the course of the distribution scheme, and plaintiff

failed to supply any allegations that statements concerning Acthar's price were false. *Id.* Finally,

with respect to the marketing scheme, the court held that plaintiff's allegations of off-label

marketing were conclusory and/or failed to establish that the alleged misrepresentation actually

resulted in more Acthar prescriptions. *Id.* 18–19. The plaintiff also failed to explain why Mallinckrodt's non-disclosure of its payments to KOLs and role in the PAP amounted to actionable omissions. *Id.* The *Plumbers* court rejected plaintiff's negligent misrepresentation claim for similar reasons.

## II.      LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id*. In evaluating a complaint on a motion to dismiss, the Third Circuit has directed courts do the following: (1) identify the elements of the claim, (2) review the complaint to strike conclusory allegations, and then (3) look at the well-pleaded components of the complaint and evaluate whether all of the elements identified in part one of the inquiry are sufficiently alleged. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In order to satisfy

Rule 9(b)'s particularity requirement, a plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged" and "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal citations omitted). In short, a plaintiff must provide "the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted).

### III.   DISCUSSION

#### i.   Rule 8

Federal Rule of Civil Procedure 8 requires that a complaint contain a "short and plain statement of the claim" and be "simple, concise, and direct." Defendants urge this Court to dismiss the Amended Complaint for failure to comply with Rule 8's requirements. (ECF No. 23-1 at 30–34.) Defendants assert that the 204-page Amended Complaint is "replete with conclusory, vague, and immaterial facts." (ECF No. 23-1 at 31 (quoting *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017)).) For example, Defendants assert that Plaintiffs concede that their claims are not based on off-label marketing or Acthar's safety or efficacy, yet devote dozens of paragraphs in the Amended Complaint to these issues; Plaintiffs do not allege that any Express Scripts Entities paid doctors, yet spend pages of the Amended Complaint describing Mallinckrodt's alleged doctor bribery scheme; and Plaintiffs devote significant space in the Amended Complaint to discuss Mallinckrodt's acquisition of Synacthen, yet fail to allege that the Express Scripts Entities had any role in this acquisition. (*See* ECF No. 23-1 at 31.) For the reasons further explained in this opinion, this Court agrees with Defendants that the Amended Complaint is both imprecise and

17

overinclusive in parts, while completely contradictory in others. However, viewed in totality the Court does not find that these deficiencies result in a violation of Rule 8.

With this in mind, the Court notes the Amended Complaint's shortcomings throughout this opinion. Any falsehoods apparent from the face of court documents incorporated by reference into the Amended Complaint or contradictions within the Amended Complaint itself have not been accepted by this Court as true.[7] (*See* ECF No. 23-1 at 33–34); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss . . . that principle does not apply to general allegations that are contradicted 'by more specific allegations in the Complaint.'") (collecting cases). Moreover, Plaintiffs refer throughout the Amended Complaint to prior actions and conduct that do not implicate the Express Scripts Entities at all. The Court has only considered those allegations that directly relate to the Defendants to this action. If the Court struck from the Amended Complaint all paragraphs that do not relate to Defendants in some way, the over 200-page complaint would be whittled down significantly, illuminating just how sparse the allegations pertaining directly to Defendants are.

### ii.    Collateral Estoppel

Defendants argue that the Bankruptcy Proceedings should act as collateral estoppel to Plaintiff's Amended Complaint. (*See, e.g.*, ECF No. 23-1 at 26–30.) As discussed above, this Court

---

[7] For example, Plaintiffs claim that "the FTC is now prosecuting Express Scripts for its 'one-stop shop' proposed to Mallinckrodt back in 2007 for Acthar." (Am. Compl. ¶ 6.) However, as Plaintiffs note in the next sentence, the September 20, 2024 FTC complaint sued Express Scripts and two other PBMs for engaging in anticompetitive and unfair rebating practices that artificially inflated the price of *insulin* drugs, which do not include Acthar. Neither Acthar nor Mallinckrodt are mentioned in the FTC complaint. *Caremark Rx, et al.*, Docket No. 9437 (F.T.C. Sept. 20, 2024), available at https://tinyurl.com/mrxr6my6.

has already considered and rejected this argument in the *Steamfitters* case and that rejection is equally applicable here. *Steamfitters*, No. 2:19-cv-03047 (E.D. Pa.) (Dkt. Nos. 152, 153).

Plaintiffs also raise collateral estoppel arguments in their response in opposition. They argue that "collateral estoppel should apply to prevent Express Scripts from relitigating issues actually decided by the federal courts in *Rockford* and *Steamfitters* where Express Scripts ***is a party*** and ***did litigate*** issues to finality [in] its Rule 12 motions to dismiss claims for federal antitrust and RICO claims, and violations of state consumer fraud statutes and common law." (ECF No. 28 at 6 n.6, 16, 19, 22 (emphasis in original).) As the *Plumbers* court stated in response to the same assertion, "Plaintiff's argument is absurd." 2020 WL 5627149, at \*10. Neither decision in *Steamfitters* nor *Rockford* was a final judgment on the merits, meaning the doctrine of collateral estoppel is inapplicable. *See Gross-Quatrone v. Mizdol*, 811 F. App'x 95, 97 (3d Cir. 2020).

Beyond that, Plaintiffs rely heavily in their brief on the similarities between the *Steamfitters* case and this matter, coupled with Judge Schiller's decision denying the *Steamfitters* defendants' motions to dismiss. (ECF No. 28 at 7–8, 10, 16–17, 19–20, 22–25, 26.) With due respect to the *Steamfitters*' court's decision, this Court does not consider the *Steamfitters* order controlling, as it included only a singular sentence regarding the indirect purchaser rule in support of the denial of the defendants' motions to dismiss. Thus, this Court has considered the opinions and analysis of each district court that has addressed similar issues to those presented in this action. Specifically, this Court has considered the *Rockford* court's detailed opinion in issuing its decision here. But again, while the opinions of other jurists sitting in a similarly situated posture as this Court can often offer helpful guidance, neither opinion is binding on this Court. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011) ("[F]ederal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges, even members of the same court.").

### iii.    Antitrust Claims

Plaintiffs bring three antitrust claims: (1) a Sherman Act Section 1 restraint of trade claim (Count 11), 15 U.S.C. § 1; (2) a Sherman Act Section 2 maintenance of monopolization claim (Count 10), 15 U.S.C. § 2; and (3) antitrust claims under the Nebraska, Florida, and Illinois state antitrust statutes (Count 12). Plaintiffs have not addressed Defendants' arguments to dismiss the antitrust claims in their brief in opposition.

"A response in opposition to a motion to dismiss that fails to respond to a substantive argument is a waiver or abandonment of that claim." *Perez v. IMA Grp.*, No. CV 23-4367, 2024 WL 2925960, at *2 (E.D. Pa. June 10, 2024) (citing *Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008)); *see Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (collecting cases). Apart from their collateral estoppel arguments, which, as discussed, are legally unsound, and arguments regarding the direct purchaser status of Plaintiffs for purposes of antitrust standing (ECF No. 28 at 17–20), Plaintiffs surprisingly do not respond to *any* of the Express Scripts Entities' arguments concerning the merits of their antitrust claims in their 25-page opposition brief. (*See* ECF No. 23-1 at 52–58.) Thus, the Court hereby dismisses the antitrust claims (Counts 10–12) without prejudice.

### iv.    Federal RICO

Plaintiffs bring claims for violation of RICO and conspiracy to violate RICO under 18 U.S.C. § 1962(c) and (d), respectively, against UBC only. To state a RICO claim, a plaintiff must plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A claim of a pattern of racketeering activities requires at least two predicate acts of racketeering activity. *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x

354, 362 (3d Cir. 2010). Here, Plaintiffs allege the predicate acts of mail fraud and wire fraud. 18 U.S.C. §§ 1341, 1343; (Am. Compl. ¶¶ 606, 612, 628). The elements of a mail fraud claim are "(1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme." *United States v. Rashid*, 39 F. Supp. 3d 649, 653 (E.D. Pa. 2014), *aff'd sub nom. Rashid v. Warden Phila. FDC*, 617 F. App'x 221 (3d Cir. 2015). The elements of wire fraud are "(1) knowing and willful participation in a scheme or artifice to defraud, (2) with specific intent to defraud, and (3) use of interstate wire communications in furtherance of the scheme." *Id.* (internal quotations omitted).

In order to successfully plead wire and mail fraud, Plaintiffs must plead a fraudulent misrepresentation or omission with particularity under Rule 9(b)'s standard. *Humana, Inc. v. Indivior, Inc.*, No. 21-2573, 2022 WL 17718342, at *3 n.30 (3d Cir. Dec. 15, 2022); *Marangos v. Swett*, 341 F. App'x 752, 756 (3d Cir. 2009). Plaintiffs argue that the "mail and wire statutes do not require a misrepresentation or omission; a scheme or artifice suffices." (ECF No. 28 at 24.) This argument not only perplexes the Court but misstates the law. The statute requires a "scheme or artifice *to defraud*." *Lum v. Bank of Am.*, 361 F.3d at 223 (a mail or wire fraud scheme "must involve some sort of fraudulent misrepresentation or omission"). One cannot defraud without making some sort of fraudulent misrepresentation or omission. Rule 9(b) also requires Plaintiffs to identify the "who, what, when and where details" of the alleged fraud. *DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 527 (E.D. Pa. 2018), *aff'd*, 2018 WL 11449580 (3d Cir. Apr. 24, 2018).

Plaintiffs fail to plead that UBC made a fraudulent misrepresentation or omission that meets the particularity requirement of Rule 9(b) in relation to any of the alleged schemes in the Amended Complaint. At the outset, the Court notes that Plaintiffs make various allegations about misrepresentations made by parties other than UBC and non-parties. These allegations do not

21

support allegations of RICO violations as to UBC. (*See, e.g.*, Am. Compl. ¶¶ 323, 328 (describing allegedly misleading statements by Mallinckrodt's CEO and Mallinckrodt's press releases about the price of Acthar).) Plaintiffs also dedicate many paragraphs to Mallincrkodt's "white coat marketing scheme" that used and bribed KOLs to promote prescriptions of Acthar for unapproved uses and doses. (*See, e.g.*, *id.* ¶¶ 4, 38, 60, 381–87, 393–94, 470.) However, when it comes time to link the "white coat marketing scheme" to UBC, Plaintiffs cursorily state that these spokes-doctors were "important spokes in the wheel of Mallinckrodt's RICO conspiracy, as they are all connected to Mallinckrodt's self-described 'HUB' at UBC and all profit as integral 'spokes' in the Mallinckrodt-UBC marketing and sales scheme." (*Id.*¶ 387.) However, nothing more is offered to support this claim and Plaintiffs do not explain UBC's role in the alleged scheme. In short, Plaintiffs fall far below Rule 9(b)'s standard, and any supposed misrepresentations related to the KOLs cannot support that UBC committed the predicate acts for a RICO violation.[8]

The Amended Complaint's allegations that *do* directly pertain to UBC in support of Plaintiffs' RICO claims fall into the following categories: (1) misrepresentations regarding Acthar's uses, efficacy, safety, and benefits (*see, e.g.*, *id.* ¶¶ 72–76, 79, 180–84, 189–91, 199–200, 614) and (2) misrepresentations regarding the reasons for Acthar's inflated price, its value relative to that price, and how the PAP affected that price (*see, e.g.*, *id.* ¶¶ 192–98, 441–45, 614).[9]

---

[8] The same is true of Plaintiffs' claims against non-party Dr. David Mandel. Plaintiffs state Dr. Mandel misrepresented the Acthar mechanism of action and its limited FDA approval. (Am. Compl. ¶ 403) When TPPs denied Acthar prescriptions, Dr. Mandel sent letters appealing those denials to UBC, which then directed them to the payor. (*Id.* ¶ 404, 406.) These letters allegedly contained false and misleading statements about the "limited FDA approval of Acthar and its purported [mechanism of action]." (*Id.* ¶¶ 404, 427.) However, the only connection to UBC alleged is that UBC directed these letters to the payors. This is insufficient to attribute those misrepresentations to UBC.

[9] To the extent that Plaintiffs claim that the Express Scripts Entities concealed their vertical integration and agreement with Mallinckrodt (*see* ECF No. 28 at 25), these allegations and their

First, Plaintiffs allege that UBC promoted Acthar off-label and made misrepresentations about its uses and safety. (*See, e.g.*, *id.* ¶¶ 72–76, 79, 180–84, 189–91, 199–200, 614.) Plaintiffs contradict themselves multiple times regarding this aspect of the scheme. The Amended Complaint states that "[t]he civil claims at issue in this case do not arise out of or depend upon the Acthar label, FDA approval (or lack thereof) or the safety or efficacy of Acthar."[10] (*Id.* ¶¶ 141, 147.) The Amended Complaint then discusses how the Express Scripts Defendants falsely promoted Acthar as "purportedly 'approved for 19 indications.'"[11] (*Id.* ¶¶ 173–80.) The Court is perplexed, yet again, as to how Plaintiffs may assert that their claims do not depend "upon any FDA standard," "FDA approval (or lack thereof) or the safety or efficacy of Achtar" (*id.* ¶¶ 141, 147), yet premise their RICO claims upon "mail or wire fraud in the form of deceptive advertising and misrepresentations, as well as concealment of material facts about Acthar, in order to mislead health care professionals and/or consumers and TPPs **about the safety, efficacy and value of Acthar** which caused Plaintiffs to pay [more] for Acthar than it would have absent Defendants' fraud." (*Id.* ¶¶ 181–82 (emphasis added).) Plaintiffs' allegations are in conflict and thus are insufficient to serve as misrepresentations underlying the predicate acts of a RICO violation.

---

factual support are not detailed in the Amended Complaint. Moreover, Plaintiffs admit in their Amended Complaint that the partnership between Mallinckrodt and the Express Scripts Entities was publicly disclosed in 2007. (Am. Compl. ¶ 496 (describing Mallinckrodt's public announcement of the Specialty Pharmacy Distribution of Acthar).)

[10] The Amended Complaint asserts that Mallinckrodt knew that the "exact mechanisms of action of [Acthar] in the treatment of infantile spasms [were] not fully understood," and this lack of understanding did not impact their training of UBC's reimbursement specialists, who were responsible for passing on Mallinckrodt's messages about Acthar's uses and benefits. (Am. Compl. ¶¶ 415, 421.) This generalized allegation, without reference to *any* specific misstatement that UBC made, much less when or to whom, fails to comply with Rule 9(b).

[11] Plaintiffs contend in one paragraph of the Amended Complaint that Acthar actually *was* approved for 19 indications. (*Compare* Am. Compl. ¶ 180 (alleging Acthar was falsely marketed as being "approv[ed] for 19 indications"), *with id.* ¶ 132 (admitting Acthar has been approved to treat 19 indications in the "present-day").)

Even if these assertions were not in conflict, "off-label marketing is not per se fraudulent." *Indiana/Kentucky/Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. CIV.A. 13-7167, 2014 WL 2115498, at \*5–6 (E.D. Pa. May 21, 2014) (collecting cases) (finding that plaintiff failed to adequately allege a misrepresentation or omission based on off-label prescriptions and promotion of a drug with sufficient specificity, even where the defendant's conduct may have constituted "improper off-label promotion" under the relevant regulations). There is no allegation that UBC actively concealed information about what Acthar's indications were. In fact, Plaintiffs allege that the SOP Mallinckrodt created for UBC stated that indications that were "not listed on the manufacturer's package insert as an approved FDA diagnos[is]" were "considered off label." (Am. Compl. ¶¶ 88–91.) The fact that UBC would accept incoming referrals that fall into the "off label" category does not in and of itself constitute a misrepresentation, nor do Plaintiffs plead with specificity why it would be. (*See id.* ¶ 191.);[12] *see Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 551 (E.D. Pa. 2014) (dismissing claims that showed "no more than [Defendant's] off-label promotion . . . which does not by itself state a claim for fraud or misrepresentation").

Second, Plaintiffs allege that UBC, at the direction of Mallinckrodt, made representations regarding the reasons for Acthar's inflated price, its value relative to that price, and that the price itself was a misrepresentation. (*See, e.g.*, *id.* ¶¶ 192–98, 441 614.) Plaintiffs allege that the talking points Mallinckrodt gave UBC included misrepresentations about why the price of the drug had increased. (*Id.* ¶ 192.) These talking points explained that the increase in price was necessary to

---

[12] The fact that the 2007 SOP and other custodial files related to the ASAP program were destroyed does not resuscitate Plaintiffs' claims. Plaintiffs cannot skirt Rule 9(b)'s requirements by vaguely alleging their claims are based on almost 20-year-old documents that it has discovered were destroyed in a different litigation. *See* Fed. R. Civ. P. 11(b)(3).

ensure the drug's "long term viability and availability" and that it had "never been a profitable drug because it is not only a difficult and expensive drug to manufacture, but is also a highly specialized, very low volume product." (*Id.* ¶¶ 192, 719.) Additionally, the talking points explained that the NORD set up a rationing program for Acthar in the 1990s since it was often not available then. (*Id.* ¶ 719.)

Under Rule 9(b), Plaintiffs must identify the "who, what, when and where details" of the alleged fraud. *DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 527 (E.D. Pa. 2018), *aff'd*, 2018 WL 11449580 (3d Cir. Apr. 24, 2018). While the Plaintiffs do allege *what* the allegedly misleading price statements were, they do not allege *when* or to *whom* they were made. Instead, they vaguely state that "one or more of the above misrepresentations were repeated to representatives of the Plaintiffs, their beneficiaries and/or their medical providers with the knowledge that these persons would rely upon such misrepresentations to the detriment of Plaintiffs." (*Id.* ¶ 193.) However, these general allegations regarding who the misrepresentations were made to—including the possibility that they were not even made to Plaintiffs, but to their beneficiaries or medical providers—are broad and simply not enough to comply with Rule 9(b)'s particularity requirement.[13] *See Rockford*, 360 F. Supp. 3d at 775 (holding it was "unclear how either Mallinckrodt or Express Scripts communicated <u>any</u>, 'misrepresentations,' let alone communications made directly, to either [plaintiff].").

Finally, charging high prices does not render the price "false" or constitute an actionable misrepresentation or omission. *Id.* at 777 ("[H]igh prices do not in and of themselves constitute

---

[13] Plaintiffs' allegations that UBC employees were (1) trained by Mallinckrodt to relay the misleading messages about Acthar's FDA approval for the five-day dose regimen to TPPs and (2) did convey those false messages also fail to specify the "who, what, when, and where" details of the alleged misrepresentations. (Am. Compl. ¶¶ 75–76.)

false representations."); *Wash. Cnty.*, 431 F. Supp. 3d at 712–13 (same); *Pipefitters*, 2020 WL 5627149, at *20 (same). Nor do the "PAP services run by UBC" constitute actionable misrepresentations or omissions. (Am. Compl. ¶¶ 441–45.) Plaintiffs detail how UBC worked with IUOE Local 542's patient to provide long term PAP assistance for a supposed MS exacerbation after insurance coverage was denied, when the patient actually qualified for a short-term PAP. (*Id.* ¶¶ 441–46.) Plaintiffs allege that this constituted an omission by somehow "circumvent[ing] patient complaints" and preventing "TPP advance awareness about Acthar's high prices." (*Id.* ¶ 106.) This evades reason. These funds assisted the patients with their copays and Plaintiffs do not allege with any particularity how they impacted TPPs' "awareness" of prices.

In short, the Amended Complaint is framed with extensive allegations and conjecture that, when opened, is hollow and devoid of the fundamental substance that is needed. Plaintiffs fail to allege any misrepresentations or omissions with the particularity required by Rule 9(b) and therefore their RICO claim must be dismissed. Because the Court finds Plaintiffs have failed to state a claim for violation of the RICO statute under § 1962(c), their claim for conspiracy to violate RICO under § 1962(d) must also fail. *See Lum v. Bank of Am.*, 361 F.3d at 227 n.5 ("Any claim under § 1962(d) based on an alleged conspiracy to violate the other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient.").

Additionally, the parties bring arguments about the application of *Illinois Brick* and "direct purchaser" standing of Plaintiffs as these issues pertain to their RICO claims. (ECF No. 23-1 at 38-40; ECF No. 28 at 17–20.) In light of the decision that the Plaintiffs have not otherwise adequately pled their RICO claims, the Court need not reach these other issues.

###### v.        Remaining State Law Claims

Defendants argue that Plaintiffs' state law claims (Counts 3–9, 12–14) are barred by the applicable statutes of limitations. (ECF No. 23-1 at 40–44.) "A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). The Court finds that Counts 3–9 and 13–14 are subject to dismissal on statute of limitations grounds because the defense is apparent on the face of the Amended Complaint.

When proceeding under diversity jurisdiction, as Plaintiffs do here (Am. Compl. ¶ 88), the Court applies Pennsylvania's tolling laws. *Hurley v. BMW of N. Am., LLC*, No. CV 18-5320, 2020 WL 1624861, at *9 (E.D. Pa. Apr. 2, 2020) ("When proceeding under diversity jurisdiction, this Court applies the law of Pennsylvania with regard to tolling."). In looking to Pennsylvania's tolling law, this Court finds that the two prior federal class actions against the Express Scripts Entities related to Acthar—*Rockford* and *Steamfitters*—cannot toll limitations for Plaintiffs' state law claims due to Pennsylvania's bar on cross-jurisdictional tolling. *Hurley*, 2020 WL 1624861, at *9. Under this rule, a Pennsylvania court would not toll the statute of limitations on state law claims based on the filing of a federal class action. *See Conyers-Carson v. Albert Einstein Medical Center*, No. 140601960, 2015 WL 3512326, at *2 (Pa. Com. Pl. May 12, 2015) ("Pennsylvania courts have repeatedly, and unambiguously, stated that the filing of an action in federal court does not toll the running of the relevant, state law-based statutes of limitations.") (collecting cases). *American Pipe* tolling, which Plaintiffs argue applies, is a federal doctrine and therefore does not apply. The Amended Complaint's state law claims thus do not benefit from tolling.

Turning to the relevant statute of limitations period, as a federal district court adjudicating state law claims, the Court must apply the choice of law rules of the forum state—Pennsylvania.

27

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In Pennsylvania, the limitations period on foreign claims "shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, **whichever first bars the claim**." 42 Pa. C.S. § 5521(b) (emphasis added). Under Pennsylvania law, a cause of action accrues for statute of limitations purposes when the plaintiff could have first maintained a viable cause of action. *William A. Graham Co. v. Haughey*, 646 F.3d 138, 146 (3d Cir. 2011).

Here, Plaintiffs' alleged injuries lie in their purchases of Acthar, and thus their claims accrued at the time that they purchased the drug. The latest initial purchase of Acthar by Plaintiffs was June 14, 2018. (Am. Compl. ¶ 94.) This was more than six years before the initial complaint in this matter was filed on August 16, 2024. Moreover, the *Rockford* complaint was filed in April 2017. As Plaintiffs state in their response in opposition, the claims asserted in *Rockford* are the "same exact claims Plaintiffs brought in their Amended Complaint here" and "the Amended Complaint is modeled after both the *Rockford* and *Steamfitters* complaints." (ECF No. 28 at 7.) The Court sees no reason, and Plaintiffs have not provided such a reason, as to why Plaintiffs would not have been able to bring the claims asserted herein at the time the *Rockford* action was filed. Regardless of whether Plaintiffs' state law claims accrued April 2017 or June 2018, they are untimely.

Turning to the applicable statutes of limitations, the Court finds that each has been passed by at least two months under Pennsylvania law. In analyzing the foreign state limitations periods for the Connecticut, Illinois, Nebraska, and Florida consumer protection laws, this Court looks to the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") as the analogous claim under Pennsylvania law. 73 P.S. § 201-1, *et seq.* This is the longest limitations period, but would have required Plaintiffs to have filed their Complaint by June 14, 2024 based on

an accrual date of June 14, 2018, Plaintiffs' latest initial purchase of Acthar. Because the "limitations period for a foreign cause of action brought in Pennsylvania courts should never be construed to be longer than would be the case if the same events had occurred in Pennsylvania to a Pennsylvania plaintiff," the Court concludes that the state claims are time barred and ends its analysis here, rather than analyzing the statutes of limitations of the foreign jurisdictions. *See Ross v. Johns-Manville Corp.*, 766 F.2d 823, 827 (3d Cir. 1985). However, the Court has included those foreign limitations periods below for reference.

| Count | Claim | Limitations Period | Analogous PA State Limitations Period |
|-------|-------|--------------------|----------------------------------------|
| 3 | Connecticut Unfair Trade Practices Act ("CUPTA") | Three years. Conn. Gen. Stat. § 42-110g(f). | Six years. 42 Pa. C.S.A. § 5527(6); *Morse v. Fisher Asset Management, LLC*, 206 A.3d 521, 526 (Pa. Super. 2019). |
| 4 | Illinois Consumer Fraud and Deceptive Practices Act ("CFA") | Three years. 815 Ill. Comp. Stat. 505/10a(e). | Six years. 42 Pa. C.S.A. § 5527(6); *Morse v. Fisher Asset Management, LLC*, 206 A.3d 521, 526 (Pa. Super. 2019). |
| 5 | Nebraska Consumer Protection Act ("CPA") | Four years. Neb. Rev. Stat. § 59-1612. | Six years. 42 Pa. C.S.A. § 5527(6); *Morse v. Fisher Asset Management, LLC*, 206 A.3d 521, 526 (Pa. Super. 2019). |
| 6 | Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") | Four years. Fla. Stat. § 95.11(3)(e). | Six years. 42 Pa. C.S.A. § 5527(6); *Morse v. Fisher Asset Management, LLC*, 206 |

| | | | A.3d 521, 526 (Pa. Super. 2019). |
|---|---|---|---|
| 7 | Negligent Misrepresentation[14] | Two years. 42 Pa. C.S. § 5524(7). | N/A |
| 8 | Aiding & Abetting/ Conspiracy | Two years. *Env't Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 727 (E.D. Pa. 2010) (aiding & abetting); *Hvizdak v. Citizens Bank of Pa.*, 2015 WL 4878639, at *5 (W.D. Pa. Aug. 6, 2015) (conspiracy). | N/A |
| 9 | Unjust Enrichment | Four years. *Harry Miller Corp. v. Mancuso Chemicals Ltd.*, 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007). | N/A |
| 13 | Conspiracy to Defraud/Concerted Action | Two years. *Hvizdak v. Citizens Bank of Pennsylvania*, 2015 WL 4878639, at *5 (W.D. Pa. Aug. 6, 2015) (conspiracy). | N/A |
| 14 | Declaratory & Injunctive Relief | Same as the underlying claims. *Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 185 (3d Cir. 1997). | N/A |

Plaintiffs argue that the doctrines of continuing violations and fraudulent concealment, as well as the discovery rule save their claims from application of the statutes of limitations and that those defenses are "well-pleaded in the Amended Complaint." (ECF No. 28 at 22; Am. Compl. ¶¶ 79, 312, 181, 185–93, 384, 453, 614, 648, 727f, 731, 803g.) However, the Court finds that none of these doctrines save the lack of timeliness of Plaintiffs' claims. Under the doctrine of fraudulent

---

[14] Plaintiffs' negligent misrepresentation claim appears to contemplate the application of Pennsylvania law. (AC ¶ 713 (citing *Bilt-Rite Contrs, Inc., v. Architectural Studio*, 866 A.2d. 270, 273 n.1 (Pa. 2005)).

concealment, "the statute [of limitations] is tolled until plaintiffs knew or using reasonable diligence should have known of the claim." *Hurley*, 2020 WL 1624861, at *9 (citing *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir. 1990)). Similarly, discovery rule tolls the statute of limitations "whenever the plaintiff, despite the exercise of reasonable diligence, is unable to know of the existence of the injury and its cause." *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991). "The statute of limitations begins to run as soon as the plaintiff has discovered or, exercising reasonable diligence, should have discovered the injury and its cause." *Id.* at 925. As discussed above, Plaintiffs were part of the *Rockford* class and therefore would have known of their claims at least by the time that complaint was filed in 2017.

Finally, the continuing violations doctrine holds an action timely when "a defendant's conduct is part of a continuing practice . . . so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred." *Beltz v. Erie Indem. Co.*, 279 F. Supp. 3d 569, 582 (W.D. Pa. 2017), *aff'd*, 733 F. App'x 595 (3d Cir. 2018). However, the doctrine requires the court to focus on "affirmative acts" rather than the effects of such acts. *Id.* The Amended Complaint alleges that the exclusive arrangement between the Express Scripts Entities and Mallinckrodt lasted from 2007 through 2017. (Am. Compl. ¶ 758.) It does not contain any allegations of conduct within the limitations period—that is, after April 2017 if the Court is to use the date that the *Rockford* complaint was filed—that could constitute a "continuing practice," nor do Plaintiffs explain what conduct would qualify as a "continuing practice" in their Response. (ECF No. 28 at 22.)

31

Therefore, under relevant Pennsylvania law, the limitations periods have passed on Plaintiffs' aforementioned state law claims (Counts 3–9, 13–14) and they are dismissed with prejudice.

## IV.    CONCLUSION

For the reasons discussed herein, the Court hereby grants Defendants' Motion to Dismiss with prejudice as to Counts 3–9 and 13–14, and without prejudice as to Counts 1–2 and 10–12. The Court grants Plaintiffs leave to replead within 21 days of the date of this order to correct the deficiencies as noted in this opinion. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**